O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ROSE S. ANDRADE, | ) | NO. EDCV 07-00174-MAN |
| | ) | |
| Plaintiff, | ) | |
| | ) | MEMORANDUM OPINION |
| v. | ) | |
| | ) | AND ORDER |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Plaintiff filed a Complaint on February 12, 2007, seeking review of the denial by the Social Security Commissioner ("Commissioner")[1] of her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). On March 5, 2007, the parties consented to proceed before the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). The parties filed a Joint Stipulation on September 21, 2007, in which: Plaintiff seeks an order reversing the

_____

[1] Michael J. Astrue became the Commissioner of the Social Security Administration on February 12, 2007, and is substituted in place of former Commissioner Joanne B. Barnhart as the Defendant in this action. (See Fed. R. Civ. P. 25(d)(1); Section 205(g) of the Social Security Act, last sentence, 42 U.S.C. § 405(g).)

Commissioner's decision and directing the payment of benefits or, alternatively, remanding for a new hearing; and Defendant requests that the Commissioner's decision be affirmed. The Court has taken the parties' Joint Stipulation under submission without oral argument.

**SUMMARY OF ADMINISTRATIVE PROCEEDINGS**

Plaintiff filed applications for DIB and SSI on July 26, 2002. (Administrative Record ("A.R.") 80-82, 312-14.) Plaintiff initially claimed to have been disabled since May 9, 1997, due to pain in her lower back, left hip, left knee, and feet. (A.R. 91.) In a subsequent filing, she stated that, since July 2002, she has continued to have the above-stated pain, as well as headaches and pain in her left shoulder and left elbow. (A.R. 123.) Plaintiff has past relevant work experience as a licensed vocational nurse, telemarketer, salesperson, and aesthetician. (A.R. 17, 19, 92, 98, 186.)

The Commissioner denied Plaintiff's claim initially and upon reconsideration. (A.R. 50-62.) On October 21, 2003, Plaintiff, who was not represented by counsel, testified at a hearing before Administrative Law Judge F. Keith Varni ("ALJ Varni"). (A.R. 21-49.) On October 30, 2003, ALJ Varni denied Plaintiff's claim (A.R. 15-20), and the Appeals Council subsequently denied Plaintiff's request for review of the ALJ's decision (A.R. 5-7).

On March 16, 2004, Plaintiff filed a complaint in this Court in Case No. EDCV 04-00296-MAN. On September 20, 2005, this Court reversed the ALJ's decision and remanded the case for further administrative

2

1   proceedings (the "2005 Order").[2]  (A.R. 360-79.)  On October 27, 2005,
2   the Appeals Council remanded the case to an Administrative Law Judge,
3   for compliance with the 2005 Order.  (A.R. 381-83.)

4

5        On April 13, 2006, Plaintiff, who was represented by counsel,
6   testified at a hearing before Administrative Law Judge James Carletti
7   ("ALJ").   (A.R. 479-518.)   On September 29, 2006, the ALJ denied
8   Plaintiff's claim (A.R. 326-39), the decision now at issue here in this
9   action.

10

11                    **SUMMARY OF ADMINISTRATIVE DECISION**

12

13        In his decision, the ALJ found that Plaintiff has not engaged in
14   substantial gainful activity since the alleged onset of disability,
15   except during the year 2000.  (A.R. 330-31.)  The ALJ further found that
16   Plaintiff suffers from severe impairments of degenerative changes at L3-
17   4,  L4-5,  and  L5-S1,  disc  protrusions  at  L2-3,  L3-4,  and  L4-5,
18   degenerative changes at T10-11, status post left ankle fracture, and
19   status post left knee injury with internal derangement. (A.R. 331-32.)
20   The ALJ also found that Plaintiff's impairments, individually or in
21   combination,  did  not  meet  or  equal  the  requirements  of  a  listed
22   impairment since January 1, 2001.  (A.R. 332.)

23

24        Assessing Plaintiff's residual functional capacity ("RFC"), the ALJ

25   ─────────────────

26        [2]   The 2005 Order found a remand warranted for two reasons:
     first, ALJ Varni had failed to adequately develop the record regarding
     Plaintiff's limitations because, *inter alia*, he failed to adequately
27   consider the opinions of various of Plaintiff's treating physicians; and
     second, ALJ Varni's assessment of Plaintiffs' credibility was flawed.
28   (A.R. 361-78.)

found that Plaintiff could lift and carry ten pounds occasionally and frequently; stand and walk for two hours of an eight hour day, and sit for six hours of an eight hour day.  (A.R. 333-38.)  The ALJ found that Plaintiff had nonexertional limitations of:  no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps or stairs; occasional balancing, stooping, kneeling, crouching, or crawling; and avoiding unprotected heights and moving machinery.  (*Id.*)  Based on this assessment as well as Plaintiff's classification as a younger person with a high school education and transferable work skills from her past relevant work experience,[3] and after considering the testimony of a vocational expert, the ALJ found that jobs which Plaintiff can perform exist in significant numbers in the national economy.  (A.R. 338-39.)  Accordingly, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act during the time period at issue.  (A.R. 339.)

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine whether it is free from legal error and supported by substantial evidence in the record as a whole.  <u>Orn v. Astrue</u>, 495 F.3d 625, 630 (9th Cir. 2007).  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (citation omitted).  The "evidence must be more than a mere scintilla but not necessarily a preponderance."  <u>Connett v. Barnhart</u>, 340 F.3d 871, 873 (9th Cir. 2003)(citation omitted).  While

---

[3]   The ALJ determined that Plaintiff cannot perform her past relevant work, because it is precluded by her RFC.  (A.R. 338.)

4

inferences from the record can constitute substantial evidence, only those "'reasonably drawn from the record'" will suffice. <u>Widmark v. Barnhart</u>, 454 F.3d 1063, 1066 (9th Cir. 2006)(citation omitted).

Although this Court cannot substitute its discretion for that of the Commissioner, the Court nonetheless must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the [Commissioner's] conclusion." <u>Desrosiers v. Sec'y. of Health and Human Servs</u>, 846 F.2d 573, 576 (9th Cir. 1988); *see also* <u>Jones v. Heckler</u>, 760 F.2d 993, 995 (9th Cir. 1985). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039-40 (9th Cir. 1995).

The Court will uphold the Commissioner's decision when the evidence is susceptible to more than one rational interpretation. <u>Burch v. Barnhart</u>, 400 F.3d 676, 679 (9th Cir. 2005). However, the Court may review only the reasons stated by the ALJ in his decision "and may not affirm the ALJ on a ground upon which he did not rely." <u>Orn</u>, 495 F.3d at 630; *see also* <u>Connett</u>, 340 F.3d at 874. The Court will not reverse the Commissioner's decision if it is based on harmless error, which exists only when it is "clear from the record that an ALJ's error was 'inconsequential to the ultimate nondisability determination.'" <u>Robbins v. Soc. Sec. Admin.</u>, 466 F.3d 880, 885 (9th Cir. 2006)(*quoting* <u>Stout v. Comm'r</u>, 454 F.3d 1050, 1055-56 (9th Cir. 2006)); *see also* <u>Burch</u>, 400 F.3d at 679.

///

///

**DISCUSSION**

Plaintiff alleges that the Commissioner did not comply with the 2005 Order in two respects.  First, Plaintiff contends that the ALJ again failed to properly consider the opinions of treating physicians.  Second, Plaintiff contends that the ALJ again failed to properly assess her credibility and, therefore, failed to properly consider her subjective complaints.

**A.   The ALJ Failed To Consider The Opinions Of Treating Physicians Properly.**

Plaintiff asserts that, in assessing her RFC, the ALJ failed:  to properly consider and develop the record regarding the opinion of one of her treating physicians, Dr. Haider; to consider the opinions of several other treating physicians, Drs. Brown, Shah, and Roberts; and to state legally sufficient reasons for discounting the opinions of two other treating physicians, Drs. Evans and Cortes.  Plaintiff argues that the ALJ erred by ignoring and/or inadequately considering these treating physician opinions and, instead, relaying on the opinions of consultative examiners in determining Plaintiff's RFC.

In assessing a claimant's RFC, the Social Security Administration's regulations favor "the opinion of a treating physician over non-treating physicians."  Orn, 495 F.3d at 631; see also Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998); 20 C.F.R. §§ 404.1527(d)(1)-(2), 416.927(d)(1)-(2).  Generally, a treating physician's opinion is given greater weight because "'he is employed to cure and has a greater

6

opportunity to know and observe the patient as an individual.'" Magallanes v. Brown, 881 F.2d 747, 751 (9th Cir. 1989)(citation omitted).  If a treating physician's opinion is "well-supported by medically-acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [the Commissioner] will give it controlling weight." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

"When an examining physician relies on the same clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions of the examining physician are not 'substantial evidence.'" Orn, 495 F.3d at 632.  However, if the examining physician "provides 'independent clinical findings that differ from the findings of the treating physician,' such findings are 'substantial evidence.'" *Id.* (citation omitted); *see also* Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001)(consultative examiner's opinion constituted substantial evidence, because it relied on an independent examination of the claimant).

If there is "substantial evidence" in the record that contradicts the opinion of a treating physician, such as an examining physician's opinion supported by independent clinical findings, the opinion of the treating physician is no longer entitled to controlling weight.  Orn, 495 F.3d at 632.  However, a finding that the treating physician's opinion "is not entitled to controlling weight does not mean that the opinion is rejected."  Social Security Ruling 96-29 at 1 ("In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test

7

for controlling weight."). In this instance, the Social Security regulations still require deference to the treating physician's opinion, but the weight to accord it is governed by the factors listed in the regulations, such as length, nature, and extent of the treatment relationship, frequency of examination, and supportability. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); Orn, 495 F.3d at 632-33. Moreover, when the opinion of a treating physician is contradicted, it may be rejected by the ALJ only for "specific and legitimate" reasons, based on substantial evidence in the record. Reddick, 157 F.3d at 725; Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). Finally, "clear and convincing" reasons supported by substantial evidence in the record are required to reject a treating physician's opinion that is uncontradicted. *Id.*

*Doctor Cortes and Doctor Evans:*

On November 7, 2003, Plaintiff was examined by Dr. Evans at the Arrowhead Regional Medical Center ("ARMC"). Dr. Evans noted that Plaintiff had a prior "history of herniated disk at multiple levels with scoliosis and severe DJD," including "obliteration of the T10-T11 joint," and she multiple MRIs has been conducted. (A.R. 470.) Dr. Evans observed "definite scoliosis," pain over the T10-T11 joint, and tenderness in the lumbar area. He also stated: "Reviewing the MRI findings confirm[s] what she has given in the history." (*Id.*) Dr. Evans assessed Plaintiff as having severe degenerative disk disease with scoliosis and stated, "[p]robably not able [to] work." (*Id.*) On November 13, 2003, Dr. Evans saw Plaintiff again to review MRI results;

8

1  Plaintiff had brought in "copies of MRIs."[4]  (A.R. 469.)  Dr. Evans
2  observed that the MRI results showed "severe multilevel lumbar
3  intevertebral disk disease extending from L5-S1 up to T9-T10." (*Id.*)
4  He opined that Plaintiff would be disabled for at least 12 months,
5  cannot stand more than 15 minutes nor sit more than 30 minutes without
6  a break, would be subject to excessive absenteeism, and was functionally
7  not employable and, therefore, permanently disabled. (*Id.*)  On February
8  10, 2004, Dr. Evans saw Plaintiff again to discuss headaches, hip and
9  low back pain, and depression, and he ordered physical therapy for her
10 hip and low back pain.  (A.R. 467.)

11

12     There is evidence that Plaintiff saw Dr. Cortes intermittently
13 between September 9, 2004, and January 26, 2006, at ARMC.  (A.R. 444-47,
14 449-62.)  Dr. Cortes's notes reflect, at varying times, assessments of
15 chronic pain, back pain, palpitations, fatigue, depression, and
16 degenerative disc disease.  (*Id.*)  However, with the exception listed
17 below, there is no evidence that Dr. Cortes ordered any testing bearing
18 on Plaintiff's claimed impairments.  On December 2, 2005, Dr. Cortes
19 signed a single-page fill-in-the blanks county benefits form, in which

20
21     [4]    Dr. Evans did not identify the MRI results he reviewed.  The
   record shows that:  an MRI of Plaintiff's left knee was performed in
22 1997, with essentially normal results (A.R. 183, 188, 240); an MRI of
   Plaintiff's lumbrosacral spine was performed in April 1999, which showed
23 a 2 to 3mm broad-based bulge and mild loss of height at L4-L5, mild
   dessication changes at the L3-4 and L4-5 discs, and mild degenerative
24 changes of the facets at L4-5 and L5-S1 (A.R. 188, 203, 206); another
   MRI of Plaintiff's lumbar spine was performed in March 2003, which
25 showed, *inter alia*, moderate degenerative changes of the facet joints
   bilaterally at the L5-S1 disc level, 2 mm and 2.55 mm bulges of the L2-3
26 and L3-4 discs respectively, a 3 mm central and 2 mm right and left
   paracentral protrusion of the disc at the L4-5 disc space level as well
27 as severe left and moderate right facet osteoarthritic changes, and
   severe disc degenerative changes at the T10-11 level (A.R. 249-52.)
28 Given his comments, it is reasonable to assume that Dr. Evans reviewed
   at least the March 2003, if not all, MRI results.

1  she stated only that:  Plaintiff has "Lumbar Intervertebral Disc Disease
2  Severe with Multilevel involvement" that was temporary and would last
3  for a year; no tests were needed to confirm this diagnosis; an ancillary
4  study (an EMG) had been ordered; and Plaintiff could perform "No work."
5  (A.R. 447.)   On that form, Dr. Cortes did not state the basis for her
6  diagnosis or her conclusions as to Plaintiff's ability to work.  (*Id.*)
7  On January 26, 2006, Dr. Cortes noted that the EMG and nerve conduction
8  studies had been performed and did not demonstrate any evidence of
9  cervical radiculopathy or any nerve entrapment.  (A.R. 445.)

11      In assessing Plaintiff's RFC, the ALJ not only declined to accord
12  the opinions of Drs. Cortes and Evans controlling weight, but accorded
13  them "little weight" and relied instead on the opinions of consultative
14  examiners.  (A.R. 334-35.)  As to Dr. Cortes, the ALJ noted that her
15  December 2, 2005 opinion was "devoid of citations to medical signs and
16  laboratory results."  (A.R. 334.)  As to Dr. Evans, the ALJ found the
17  treating relationship to be too brief, because the record showed that
18  Dr. Evans has seen Plaintiff only once (November 7, 2003) prior to
19  rendering his opinion of November 13, 2003.  (*Id.*)  As to both Dr.
20  Cortes and Dr. Evans, the ALJ stated that:  their opinions were
21  "refuted" by and/or inconsistent with the opinions of Drs. Meltzer,
22  Dorsey, Rhoe, Schweller, and Melendez;[5] their opinions were contradictory

24      [5]   In September 2002, **Dr. Meltzer**, a orthopedic surgeon, examined
25  Plaintiff and stated he found the information obtained from her to be
    "reasonably reliable."  (A.R. 221.)   He apparently reviewed the April
    1999 MRI, and concluded that the "changes in her back" are "quite mild."
26  (A.R. 222, 228.)   He reported "a paucity of physical findings" and
    opined that this was "because it is difficult to get her to cooperate
27  fully."  (A.R. 228.)  He observed that Plaintiff "walks with a slight
    antalgic gait on her left side."  (A.R. 226.)  Dr. Meltzer opined that
28  Plaintiff could lift/carry 20 pounds occasionally and 10 pounds

to the reports of three of these doctors that Plaintiff's gait was normal or nearly normal; their opinions contradicted the weight of the record as a whole; and opinions as to disability are reserved to the Commissioner.  (A.R. 334-35.)

The ALJ's assertion that the ultimate question of disability is reserved to the Commissioner is, of course, correct.  *See* 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1).  However, this rule did not justify giving the opinions of these two treating physicians little weight and/or rejecting them *in toto*.  *See* SSR 96-5p, 1996 WL 274183, *3 ("opinions from any medical source on issues reserved to the

frequently, stand/walk up to six hours if wearing a brace, sit for six hours, could climb stairs and occasionally stoop, but could not walk on uneven terrain, climb ladders, or kneel or crouch.  (A.R. 228.)

In January 2003, **Dr. Dorsey** examined Plaintiff.  He too reviewed the April 1999 MRI, as well as Dr. Meltzer's opinion.  (A.R. 240-41.)  He observed that Plaintiff's gait is normal.  (A.R. 242.)  Dr. Dorsey opined that the MRI findings were consistent with Plaintiff's age and found that she has no impairment-related physical limitations.  (A.R. 243.)

On an unspecified date, **Amber Rhoe**, a chiropractor, wrote a "to whom it may concern" letter.  She stated that she treated Plaintiff on seven occasions in February-March 2003, and opined that Plaintiff should not lift more than 20 pounds at any time and should not perform repetitive bending or lifting, crawling, or prolonged sitting.  (A.R. 246.)

On August 30, 2005, **Dr. Melendez**, a treating physician at ARMC who saw Plaintiff once, reported that Plaintiff has 5/5 strength in her upper and lower extremities.  (A.R. 448.)

On August 8, 2006, **Dr. Schweller**, a neurologist, examined Plaintiff.  He apparently reviewed the March 2003 MRI results, although this is unclear.  (A.R. 471.) He observed that Plaintiff had a "mild antalgic gait." (A.R. 472.)  Dr. Schweller opined that Plaintiff could lift ten pounds occasionally and frequently, stand and walk for two hours, sit for six hours, should avoid kneeling, crawling, unprotected heights, and exposure to moving machinery, and should have "occasional limits in bending, stooping, and squatting." (A.R. 473.)

Commissioner must never be ignored"); *see also* SSR 96-2p, 1996 WL
374188, at *2 ("It is not unusual for a single treating source to
provide medical opinions about several issues; for example, at least one
diagnosis, a prognosis, and an opinion about what the individual can
still do.  Although it is not necessary in every case to evaluate each
treating source medical opinion separately, adjudicators must always be
aware that one or more of the opinions may be controlling while others
may not.  Adjudicators must use judgment based on the facts of each case
in determining whether, and the extent to which, it is necessary to
address separately each medical opinion from a single source.").  While
the ALJ was not required to accept as binding the portions of the
treating physicians' opinions stating that Plaintiff cannot work, Social
Security Administration policy directed that he contact these physicians
to obtain an explanation of the bases for such conclusions.  *See* SSR 96-
5p, 1996 WL 274183, *2 ("[O]ur rules provide that adjudicators must
always carefully consider medical source opinions about any issue,
including opinions about issues that are reserved to the Commissioner.
For treating sources, the rules also require that we make every
reasonable effort to recontact such sources for clarification when they
provide opinions on issues reserved to the Commissioner and the bases
for such opinions are not clear to us.").


    While the ALJ correctly observed that Dr. Cortes's December 2, 2005
opinion did not cite any clinical findings, this does not mean that her
opinion was not based on any such findings.  Dr. Cortes began treating
Plaintiff after she had been treated by Dr. Evans.  As described above,
Dr. Evans viewed Plaintiff's MRI results, including those from the most
recent MRI of November 2003, and set forth a number of those MRI

findings in Plaintiff's ARMC medical records -- records that Dr. Cortes presumably reviewed when she began treating Plaintiff. There is no rational reason for concluding, as the ALJ apparently did, that Dr. Cortes's quite specific diagnosis was plucked from thin air and bereft of clinical support. If the ALJ had any concerns or questions in this respect, particularly given the length of Dr. Cortes's treating relationship with Plaintiff, it was incumbent upon the ALJ to fully and fairly develop the record on this issue. *See, e.g.*, <u>Celaya v. Halter</u>, 332 F.3d 1177, 1183 (9th Cir. 2003); <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1150 (9th Cir. 2001).

Moreover, the ALJ's assertion that Dr. Cortes's opinion is refuted by or contradictory to the opinions of the consultative examiners and other doctors is not legitimate. Dr. Cortes did not opine as to Plaintiff's gait or as to Plaintiff's extremity strength, and the ALJ's assertion that she opined on these questions in a manner that was "inconsistent with" the opinions of the five doctors described in Note 5 and "contradictory to the evidence" (A.R. 335) is baseless and misstates the record. Dr. Cortes also did not opine as to any limitations, exertional or non-exertional, on Plaintiff's part,[6] and thus, her opinion cannot be said to be contradicted in this respect by the opinions of the other physicians on this issue.[7] With respect to Dr.

---

[6]     Again, given Dr. Cortes's diagnosis and the length of her treating relationship and in order for the ALJ to develop the record fully and fairly, the ALJ should have asked Dr. Cortes to render an opinion on Plaintiff's limitations.

[7]     It is somewhat ironic that the opinions of the consultative examiners on this issue are "inconsistent" and "contradictory" themselves, yet are given "greater weight" by the ALJ than those of the treating physicians. Dr. Meltzer found limitations consistent with

Cortes's diagnosis of "Lumbar Intervertebral Disc Disease Severe with Multilevel involvement," that diagnosis is supported by the March 2003 MRI results, results that were not available to Dr. Meltzer when he opined that Plaintiff had "mild degenerative changes at L4-5, L5-S1" (A.R. 228) and were not available to Dr. Dorsey when he opined that Plaintiff's MRI findings are normal for someone of her age (A.R. 243). Significantly, the one consultative examiner who apparently did review those MRI results, Dr. Schweller, opined that Plaintiff has "multiple degenerative disc disease" (A.R. 473), *i.e.,* opined consistently with Dr. Cortes. Nothing in Dr. Cortes's opinion is contradicted or refuted by the opinion of Dr. Rhoe, the chiropractor, who, in any event, did not purport to opine as to Plaintiff's impairments, did not support her opinion with any medical findings, and is not an acceptable medical source, unlike Dr. Cortes. *See* 20 C.F.R. §§ 404.1513(d)(1), 416.013(d)(1). In short, the ALJ's finding that Dr. Cortes's opinion was "inconsistent with the weight of the record as a whole" (A.R. 335) is not supported by the record, is not legitimate, and does not constitute substantial evidence. *See* Reddick, 157 F.3d at 723 (misleading paraphrasing of the record constitutes error).

As to Dr. Evans, the ALJ correctly observed that the treating relationship was brief prior to his issuance of the November 2003

---

light work, Dr. Schweller found limitations consistent with sedentary work, and Dr. Dorsey found no limitations at all and, therefore, that Plaintiff is able to do heavy work. The ALJ utilized Dr. Schweller's opinion in formulating his RFC determination. The ALJ does not explain why, in resolving this issue, it was appropriate to reject out-of-hand the contradictory opinion of Dr. Dorsey and to substantially reject the inconsistent opinion of Dr. Meltzer, while at the same time according them "greater weight" than the opinions of Plaintiff's treating physicians due to their purported conflict with the opinions of other physicians.

opinion in issue, a factor that bears on the weight to be given the opinion.   Of course, the "relationship" between Plaintiff and Drs. Meltzer, Dorsey, and Schweller, the consultative examiners, was equally, if not more, brief.   As with Dr. Cortes's opinion, Dr. Evans's diagnosis of "severe multilevel lumbar intevertebral disk disease extending from L5-S1 up to T9-T10" (A.R. 469) is supported by the March 2003 MRI results not available to two of these consultative examiners and is not inconsistent with the opinion of the third, Dr. Schweller.   Dr. Evans did not opine as to Plaintiff's gait, extremity strength, or as to any limitations other than sit/stand; hence, as with Dr. Cortes, the ALJ's assertion that Dr. Evans's opinion was refuted or contradicted by the opinions of the consulting physicians and a chiropractor on these issues is without legitimacy and does not constitute substantial evidence.

Dr. Evans did opine that Plaintiff cannot stand more than 15 minutes nor sit more than 30 minutes without a break -- an opinion that differed significantly from the sit/stand limitations stated by Dr. Meltzer (six hours for each act), Dr. Dorsey (zero limitations), and Dr. Schweller (two hours and six hours respectively).   However, as noted above, unlike Dr. Evans, neither Dr. Meltzer nor Dr. Dorsey had reviewed Plaintiff's March 2003 MRI results.   Hence, the ALJ's assertion that their opinions on this issue carried greater weight than that of this treating physician is not legitimate.   While Dr. Schweller apparently had reviewed this MRI, the ALJ has not stated any specific or legitimate reason why his opinion should be favored over that of Dr. Evans, the treating physician.   Finally, the ALJ's assertion that Dr. Evans's opinion on this issue was "inconsistent with the weight of the record as a whole" (A.R. 335) is not supported by the evidence of record and is

15

1  not legitimate.

2

3       Even if, *arguendo*, the opinions of Drs. Cortes and Evans, to some

4  extent, were contradicted by and/or inconsistent with the opinions of

5  other doctors whose opinions constitute "substantial evidence," and

6  therefore, such treating physicians' opinions appropriately were not

7  accorded controlling weight, the ALJ was required to state specific and

8  legitimate reasons for rejecting these opinions, which were consistent

9  with the factors set forth in 20 C.F.R. §§ 404.1527(d)(2) and

10 416.927(d)(2) and for according them "little weight."  For the reasons

11 set forth above, the ALJ did not meet this duty.  Accordingly, the ALJ's

12 rejection of the opinions of Drs. Cortes and Evans was error.

13

14 *Doctor Brown, Doctor Roberts, and Doctor Shah:*

15

16       Dr. Brown treated Plaintiff from at least from September 11, 1997,

17 to April 27, 2000, for knee, hip, foot, and back pain.  (A.R. 162-85,

18 190-208.)  During that period of time, he rendered numerous opinions as

19 to Plaintiff's impairments and her ability to work, apparently in

20 connection with worker's compensation proceedings.  (A.R. 170-74, 176-

21 80, 182-85, 198-201, 203-06.)  Among other things, he noted various

22 limitations stemming from Plaintiff's left knee condition, opined that

23 Plaintiff needed chronic pain management measures, recommended that

24 further diagnostic studies for her left knee pain be performed, and

25 stated that surgery on her knee might be required.  (*Id.*)  Dr. Brown's

26 opinion was based not only on his ongoing examinations and treatment of

27 Plaintiff but also on his review of the April 1999 MRI results, as well

28 as an MRI of her left knee and a gait analysis performed by another

16

1   physician.  (*Id.; see also* A.R. 194-97.)

2

3       The ALJ's decision, however, ignores this evidence of record

4   entirely.  The ALJ states no reasons for doing so.[8]  In its 2005 Order,

5   the Court expressly noted and described Dr. Brown's December 1997

6   evaluation and March 2000 progress report and described them as raising

7   the possibility that Plaintiff's RFC is more limited than the light work

8   RFC found by ALJ Varni.  (A.R. 369.)  Accordingly, the ALJ's failure to

9   acknowledge or give any reasons for rejecting Dr. Brown's opinion was

10  error.[9]  <u>Smolen v. Chater</u>, 80 F.3d 1273, 1286 (9th Cir. 1996).

11

12      Dr. Shah saw Plaintiff on one occasion, April 18, 2003, for

13  purposes of an evaluation in connection with Plaintiff's attempt to

14  obtain MediCal coverage for medical treatment.  (A.R. 252.)  Dr. Shah

15  examined Plaintiff and noted the results of his examination.  He also

16  reviewed the results from her April 1999 and March 2003 MRIs and noted

17  severe disc desiccation at L4-5 and L5-S1, as well as severe disc

18  _____

19      [8]   The ALJ found that, because Plaintiff had worked in 2000, and
20  an initial determination denial of August 16, 1999, was binding, the
    question to be resolved was whether Plaintiff was under a disability
21  that began on January 1, 2001.  (A.R. 331.)  Plaintiff has not
    challenged that finding.  Dr. Brown's opinions, of course, predate
22  January 1, 2001.  Even if that was the reason why the ALJ ignored Dr.
    Brown's opinions, the ALJ failed to state such a reason; this Court
23  cannot supply it for him.  *See* <u>Connett</u>, 340 F.3d at 874 (a reviewing
    court is "constrained to review the reasons the ALJ asserts," and an
24  ALJ's decision cannot be affirmed on the basis of evidence he did not
    discuss).

25      [9]   Respondent's assertion that the ALJ's imposition of a
    limitation to occasional balancing, stooping, kneeling, crouching, or
26  crawling was not inconsistent with Dr. Brown's March 2000 opinion that
    Plaintiff must "avoid any type of repetitive kneeling[,] squatting or
27  crawling activities" (A.R. 194) is not persuasive, and ignores the
    remainder of Dr. Brown's opinions during his three-year treating
28  relationship with Plaintiff.

                                    17

degenerative changes at the T10-11 level. (*Id.*) Dr. Shah stated that Plaintiff "is in need of medical treatment" and recommended that she undergo a course of physical therapy and pain management. (*Id.*) The ALJ, however, acknowledged only one aspect of Dr. Shah's opinion, stating simply that Dr. Shah "assessed the claimant with severe degenerative disc changes at T10-11 on April 18, 2003 (Exhibit 16F/1)." (A.R. 332.)

It is not clear to the Court that Dr. Shah properly is viewed as a treating physician within the meaning of the Social Security regulations. *See* 20 C.F.R. §§ 404.1502, 416.902 (defining "treating source" as someone who provides medical treatment or evaluation *and* who has or has had "an ongoing treatment relationship with" the claimant, which means seeing the physician "with a frequency consistent with acceptable medical practice for the type of treatment or evaluation required for" the claimant's condition). Plaintiff apparently saw Dr. Shah only once to obtain an evaluation in connection with her attempt to obtain MediCal coverage. There is no evidence of an ongoing treatment relationship. Hence, the Court finds no error in the ALJ's failure to accord Dr. Shah's opinion controlling weight, as Dr. Shah more appropriately is treated as an examining physician. However, Dr. Shah assessed Plaintiff's back impairment as worse that it was characterized by the ALJ, and at a minimum, his opinion indicated his belief that Plaintiff needs ongoing medical treatments based on her back impairment -- a factor that bears on her RFC and ability to work. *See* <u>Erickson v. Shalala</u>, 9 F.3d 813, 817 (9th Cir. 1993) (ALJ must consider "all factors" that might have a significant impact on claimant's ability to work). Dr. Shah's opinion, while cursory, was supported by clinical

18

1  findings.   Hence, as to those portions of the opinion that the ALJ
2  ignored and, thus, implicitly rejected (<u>Smolen</u>, 80 F.3d at 1286), the
3  ALJ was required to state clear and convincing reasons for rejecting
4  them to the extent they were uncontroverted, and to the extent they were
5  controverted, the ALJ was required to state specific and legitimate
6  reasons for rejecting them.  <u>Lester v. Chater</u>, 81 F.3d 821, 830-31 (9th
7  Cir. 1995).  The ALJ erred in not doing so.

8

9  Dr. Roberts conducted an independent medical examination of
10 Plaintiff and reported his results to the State of California Employment
11 Development Department on February 2, 1999.  (A.R. 149-50.)  He noted
12 that the MRI of Plaintiff's knee showed an effusion medially, but no
13 evidence of a meniscal tear, Plaintiff's range of motion in her knee was
14 full and complete, there was no evidence of atrophy, and her gait was
15 slightly altered, favoring the left.  His diagnostic impression was
16 possible internal derangement of her left knee, but he stated that a
17 further MRI would be needed to ascertain whether a medial tear existed.
18 He opined that Plaintiff should be able to return to work as an LVN.
19 (A.R. 150.)  The ALJ's decision does not mention Dr. Roberts' opinion,
20 but the Court finds no reversible error.  Dr. Roberts appears to have
21 acted as a consultative examiner, not a treating physician.  The ALJ
22 found that Plaintiff has a severe impairment in her left knee of an
23 internal derangement, and imposed limitations and an RFC substantially
24 more restrictive than Dr. Roberts' finding that Plaintiff was capable of
25 resuming her LVN duties.  Even if there was an error in failing to
26 acknowledge Dr. Roberts' opinion, and the Court does not believe there
27 was, any such "error" was harmless within the meaning of the standard
28 discussed above.

19

*Dr. Haider:*

Dr. Haider conducted an Agreed Medical Evaluation of Plaintiff on September 8, 1999, in connection with her complaint of lower back pain that radiated to her left lower extremity and as part of her worker's compensation proceedings. (A.R. 266-67.) He found neither tenderness in Plaintiff's upper back nor evidence of scoliosis. (A.R. 268.) As to Plaintiff's lumbrosacral spine, he observed that Plaintiff had difficulty walking, changing positions, and getting onto the examination table, and walked with an antalgic gait favoring the left lower extremity. (*Id.*) Plaintiff had tenderness in her lower back from L4 to S1, her range of motion was 80% of normal, and she experienced increased pain with flexion and extension. (A.R. 269.) He noted that the April 1999 MRI results and an x-ray showed a 2 to 3 mm disc herniation at L4-5, disc desiccation at L3-4 and L4-5, and moderate facet disease at L4-5 and L5-S1. (A.R. 270.) Dr. Haider opined that Plaintiff did sustain an injury to her lower back in May 1997, and he planned to review the actual films from the April 1999 MRI to determine whether Plaintiff had a true disc herniation or a simple disc bulge. (A.R. 272.) On September 29, 1999, after reviewing the April 1999 MRI scan, Dr. Haider stated that Plaintiff has severe disc desiccation at L4-5 and moderate facet disease at L4-5 and L5-S1. He opined that her lower back disability is permanent and stationery, and she is "precluded from very heavy work." (A.R. 262-63; *see also* 260 - October 4, 1999 Summary Form findings.)

On November 22, 1999, Dr. Haider issued a supplemental report based on his receipt and review of a Dynamic Gait Analysis. He concluded that

Plaintiff's gait abnormality was not the result of a work injury, but exacerbated her lower back condition, and recommended she receive an orthotic.  (A.R. 258.)  On February 15, 2000, Dr. Haider made a "Chart Note" stating, "[w]e just had a deposition on this patient" and "[n]othing was essentially changed in my report."  (A.R. 256.)

On April 28, 2003, Dr. Haider saw Plaintiff for a second time for an evaluation in connection with her attempt to obtain MediCal coverage for medical treatment, because she cannot afford medical care.  (A.R. 254-55.)  He observed tenderness and muscle spasm in her lower back from L2 to S1, with increased pain on flexion and extension.  He reviewed Plaintiff's May 2003 MRI scan.  He opined that Plaintiff has severe disc dessication at L3-4 and L4-5 and L5-S1[10] and moderate facet disease at L4-5 and L5-S1.  (Id.)  Dr. Haider opined that Plaintiff needs treatment for her lower back, including physician visits, medications, physical therapy, and epidural steroid injections.  (Id.)

The ALJ did not mention Dr. Haider's 1999 findings.  In connection with his Step 2 assessment of whether Plaintiff has severe impairments, the ALJ noted, without discussion, Dr. Haider's April 29, 2003 diagnosis of severe disc desiccation and moderate facet disease, but did not acknowledge Dr. Haider's opinion as to the medical treatment Plaintiff needs for these impairments.  (A.R. 331.)

As a threshold issue, it is not clear to the Court that Dr. Haider properly is viewed as a treating physician within the meaning of the

---

[10]   Somewhat inconsistently, Dr. Haider stated that the March 2003 MRI showed severe disc desiccation at L4-5 and L5-S1.  (A.R. 254.)

Social Security regulations, *i.e.,* 20 C.F.R. §§ 404.1502, 416.902.
Plaintiff saw Dr. Haider once in 1999, when he acted as an agreed
medical evaluator for purposes of her worker's compensation proceeding.
She did not see him again until four years later, when she sought an
evaluation to support her attempt to obtain MediCal coverage.  While Dr.
Haider then opined that Plaintiff would need medical treatment, he did
not establish a course of treatment for her or prescribe any medication,
and he did not examine or otherwise see her again.  (*See* A.R. 30-31.)
On the record before the Court, there was not an "an ongoing treatment
relationship" between Plaintiff and Dr. Haider, and Dr. Haider more
properly is viewed as an examining physician.  Hence, the ALJ was not
required to accord Dr. Haider's opinions controlling weight.

     The ALJ's failure to address Dr. Haider's 1999 opinions, if error,
was harmless.  Dr. Haider, in 1999, did not opine that Plaintiff could
not work; rather, he opined that, with her then-assessed back condition,
she could not perform "very heavy work."  The ALJ's RFC assessment was
substantially more favorable to Plaintiff than that indicated by Dr.
Haider's assessment.

     With respect to Dr. Haider's subsequent 2003 opinion, however, the
ALJ improperly failed to address Dr. Haider's conclusion that Plaintiff
required medical treatment, including medications, physical therapy,
epidural steroid injections, and physician visits.  Significantly, that
opinion was consistent with Dr. Shah's effectively contemporaneous
opinion regarding Plaintiff's need for medical treatment.  That opinion,
arguably, was relevant to Plaintiff's ability to work, and if the ALJ
wished to reject it, he should have set forth clear and convincing

reasons for doing so, rather than simply ignoring it. <u>Lester</u>, 81 F.3d at 830-31; <u>Erickson</u>, 9 F.3d at 817.

*       *       *

As discussed above, the Court has found that the ALJ erred in connection with his treatment of the opinions of Doctors Brown, Cortes, Evans, Haider, and Shah. Accordingly, reversal on this basis is warranted.

**B.   The ALJ's Finding Regarding The Credibility Of Plaintiff's Claimed Symptoms And Limitations Is Reversed.**

Plaintiff contends that the ALJ failed to consider her subjective complaints, and to assess her credibility, properly. (Joint Stip. at 11.)

Once a disability claimant produces evidence of an underlying physical impairment that is reasonably likely to be the source of his subjective symptom(s), all subjective testimony as to the severity of the symptoms must be considered. <u>Moisa v. Barnhart</u>, 367 F.3d 882, 885 (9th Cir. 2004); <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 345 (9th Cir. 2001)(<i>en banc</i>); <i>see also</i> 20 C.F.R. § 404.1529(a) (explaining how pain and other symptoms are evaluated). Moreover, "unless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each." <u>Robbins</u>, 466 F.3d at 883. Further, the ALJ's credibility findings must

23

be "sufficiently specific" to allow a reviewing court to conclude that the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony.  <u>Moisa</u>, 367 F.3d at 885.

Plaintiff enumerated various subjective symptoms, both in her filings with the Commissioner and in her testimony.  She stated that she has pain in her lower back every day, which is worse some days than others, and pain in her left hip, left knee, and left ankle, which is exacerbated by standing or walking for 20 minutes or more or sitting for a long time.  Her ankle and/or knee sometimes gives way when she is walking.  (A.R. 29, 31-32, 34, 91, 98-99, 110, 113, 114.)  On bad days, she takes pain medications such as Vicodin, Ultram, Tylenol with codeine, Naprosyn, or Motrin for the pain and usually stays in bed.  The Vicodin makes her sleepy and, sometimes, her stomach hurts.  Sometimes, she takes Halcion to sleep.  On good days, she is more functional and tries to be more active.  (A.R. 34-36, 99, 110, 119, 487-88, 493-95.)  Occasionally, she uses a knee brace, but she does not use a cane or corset.  (A.R. 32-33, 111, 113-14.)  Plaintiff's back pain has gotten worse in recent years and radiates into her hip.  (A.R. 499.)  More recently, Plaintiff has experienced neck pain that bothers her shoulders, and she does not know if it stems from stress or back pain.  Occasionally, her left hand goes numb, although it does not hurt.  (A.R. 496-98, 500.)  She has not been able to obtain MRIs of her hip or neck, because she lacks money to pay for them.  (A.R. 500.)  Plaintiff stated that she:  needs assistance with mopping, sweeping, lifting heavy items, and "heavy" housework; is able to walk 20 to 25 minutes without resting; can stand 20-25 minutes if she leans against something; can sit for 30

minutes if she can reposition herself periodically; can drive; and can do light housekeeping chores without assistance.  (A.R. 36, 112, 487.) She believes that, with the assistance of her boyfriend, she might be able to perform demonstration work in short stints on good days, but she could not do so on bad days, which occur several days a week.  (A.R. 501-02.)

     The ALJ enumerated a laundry list of reasons for finding Plaintiff's statements and testimony about her subjective symptoms to be not credible.  When examined in the light of the record, however, these reasons do not withstand scrutiny.

     The ALJ first deemed Plaintiff not credible, because he concluded that Plaintiff does not have a severe psychiatric impairment.  (A.R. 335.)  Plaintiff, however, did not assert that any mental impairment precluded her from working.  Indeed, the ALJ acknowledged earlier in his decision that "neither [Plaintiff] nor [her attorney] has asserted that [Plaintiff] has psychiatric functional limitations." (A.R. 332.)  Thus, it is puzzling why the ALJ believed the non-existence of something Plaintiff did not even contend existed rendered her not credible.  This illogical reason plainly is not clear and convincing.

     Second, the ALJ deemed Plaintiff not credible, because he rejected the opinions of Doctors Cortes and Evans.  (A.R. 335.)  However, as discussed above, that rejection was error.  Moreover, Dr. Evans's opinion as to Plaintiff's ability to sit and stand, and her likelihood of excessive absenteeism, was fully consistent with her statements and testimony on these issues.  This reason, too, is not convincing.

1    Third, the ALJ asserted that the "record does not show that
2  [Plaintiff] requires any special accommodations (*e.g.* special breaks or
3  positions)," because both Drs. Meltzer and Schweller stated that she
4  "does not require an assistive device for ambulation." (A.R. 336.)
5  However, Plaintiff did not claim to need an ambulation device; indeed,
6  she has strongly insisted that she does *not* need an assistive device for
7  ambulation and has never used one. (A.R. 113.) Moreover, Dr. Meltzer's
8  sit/stand limitations were conditioned on Plaintiff receiving
9  "appropriate breaks." (A.R. 228.) Hence, this reason also is not
10  convincing.

11

12    Fourth, the ALJ asserted that the "record does not indicate that
13  [Plaintiff's] medications are ineffective or that they cause her
14  debilitating side effects" and Plaintiff failed to complain about any
15  medication side effects to her physicians. Plaintiff, however, did not
16  contend that her medications were ineffective; indeed, she conceded that
17  they "help take the edge off the pain." (A.R. 494.) Moreover,
18  Plaintiff did not contend that medication side effects limited her
19  ability to work, much less that she experienced "debilitating" side
20  effects. Rather, she testified that: she took certain pain relief
21  medications every day, including on good days, and only took others on
22  bad days; and the medication that made her sleepy was Vicodin, which she
23  took only on bad days, *i.e.,* when she was experiencing pain significant
24  enough to cause her to stay in bed. (*Id.*) Moreover, Plaintiff obtained
25  her medications for many years from Mexico, because she could not afford
26  medical treatment. The fact that when Plaintiff did not complain about
27  sleepiness from Vicodin when, in more recent years, she began to obtain
28  her medications through prescription is of no moment, given that

1  sleepiness is a commonly known side effect of this narcotic pain
2  reliever, and Plaintiff took this medication only on days she stayed in
3  bed.  Accordingly, this reason also is not convincing.

5      Fifth, the ALJ asserts that the "evidence does not support
6  [Plaintiff's] claims of physical weakness," noting that various
7  physicians had assessed her as having 5/5 strength.  (A.R. 336.)  This
8  reason, like the others discussed above, rests on a straw man, because
9  Plaintiff did not state that physical weakness is one of her subjective
10 symptoms.  Rather, she complained of pain manifested in various
11 respects.  Hence, this reason also is not convincing.

13     As his sixth, seventh, eighth, tenth, and eleventh reasons, the ALJ
14 asserts that Plaintiff's claims of disabling difficulty in
15 standing/walking and due to pain in her left hip, knee, ankle, and feet,
16 of disabling back pain, and of neck, shoulder, and left elbow pain are
17 refuted by the evidence, given:  Dr. Meltzer's findings that Plaintiff
18 has a normal range of motion in her hips and lumbar range, a full
19 cervical, shoulder, and left elbow range of motion, and she walks with
20 a slight antalgic gait on her left side; Dr. Dorsey's findings that
21 Plaintiff has a normal range of motion in her shoulders, left elbow,
22 ankles, knees, and hips and in her lumbar range (with one exception), a
23 limited cervical range of motion, and a normal gait; and Dr. Schweller's
24 findings that Plaintiff has a full range of motion in her extremities,
25 a largely normal back range of motion, a full cervical range of motion,
26 and a mildly antalgic gait.  (A.R. 336-37.)  The record indisputably
27 shows, and as the ALJ concedes, Plaintiff suffers from multiple degrees
28 of degenerative disc disease, status post left ankle fracture, and a

27

left knee that was injured, resulting in internal derangement, and has suffered from these conditions for many years. These are objectively-determined medical conditions that are reasonably likely to be the source of a subjective symptom such as pain, as well as limitations on one's ability to freely walk, stand, and sit. That Plaintiff's gait may be no worse than mildly antalgic, and that she retains normal ranges of motion, is not inconsistent with her suffering from pain due to her underlying, objectively-determined, medical conditions. The ALJ's assertion that Plaintiff's pain allegations must be disbelieved, because she retains normal to less than normal flexibility and only a mild degree of gait alteration to counteract pain, is not convincing.

Ninth, the ALJ found Plaintiff's claim of "disabling headaches" not credible, because the only record evidence of such was Dr. Evans's assessment of probable migraine headaches, which lacked citation to objective medical findings. (A.R. 337.) The ALJ again misstated Plaintiff's claim. Plaintiff did not list headaches as a basis for disability in her Disability Report. (A.R. 91, 98-99.) She did not list them in her Pain Questionnaire. (A.R. 110-12.) She also did not list them in her testimony at either hearing. (25-48, 487-506.) The sole time Plaintiff mentioned headaches was in her Request for Hearing: when asked whether there had been any change in her condition since July 2002, Plaintiff stated simply that she "get[s] headaches that start at the base of [her] neck." (A.R. 123.) The ALJ's assertion that Plaintiff claims to be disabled based on headaches simply is not true, and certainly is not convincing. Reddick, 157 F.3d at 723.

Twelfth, the ALJ asserts that Plaintiff's claim of hand numbness is

1  not credible, because:  Dr. Meltzer found her to have a full range of
2  hand motion and no sensory loss; Dr. Dorsey reported her to have normal
3  sensation in her upper and lower extremities; Dr. Melendez found no
4  obvious atrophy of certain muscles in either hand and intact sensation
5  to light touch; Dr. Cortes did find fingertip numbness; and Dr.
6  Schweller found no sensory deficits in Plaintiff's upper and lower
7  extremities.  (A.R. 337.)  The record shows that Plaintiff: complained
8  to Dr. Melendez, an ARMC treating physician, of pain radiating into her
9  arm on August 30, 2005, resulting in some arm numbnesss, but did not
10 complain of hand numbness; and first complained of hand numbness in
11 January 2006, to Dr. Cortes.  (A.R. 444-45, 448.)  As the ALJ conceded,
12 Plaintiff's treating physician, Dr. Cortes, did assess Plaintiff with
13 numbness of the fingertips in January 2006.  (A.R. 444.)  Plaintiff
14 testified in April 2006, that she experienced left hand numbness, but
15 not pain, "[s]ome of the time" when she wakes up in the morning; during
16 the day, the sensation is more like tingling.  (A.R. 496-97.)  She
17 testified that activities such as washing dishes or holding onto the
18 steering wheel did not cause her hand to go numb, but her hand sometimes
19 bothered her when performing facials.  (A.R. 497-98.)  Plaintiff,
20 however, did not claim that her occasional hand numbness was disabling.
21 Under these circumstances, the ALJ's finding that Plaintiff lacked
22 credibility based on her claim of left hand numbness is not convincing.
23
24      Thirteenth, the ALJ noted a statement by Plaintiff (apparently from
25 2003) that, because she no longer can work as an LVN, she would like to
26 obtain training in a new field so that she can work.  The ALJ asserted
27 that Plaintiff's expression of a desire for employment training proves
28 "that she does not consider herself to be disabled."  (A.R. 337.)  That

Plaintiff would prefer to work rather than rely on disability benefits and/or may be forced to attempt to work due to economic necessity does not preclude a finding that she is disabled within the meaning of the Social Security Act and/or that she lacks credibility. *Cf*. <u>Lingenfelter v. Astrue</u>, 504 F.3d 1028, 1038-39 (9th Cir. 2007)("It does not follow from the fact that a claimant tried to work for a short period of time and, because of his impairments, *failed*, that he did not then experience pain and limitations severe enough to preclude him from *maintaining* substantial gainful employment.  Indeed, we have suggested that similar evidence that a claimant tried to work and failed actually *supported* his allegations of disabling pain; and when the claimant attempted to work because of economic necessity, "it is at least as likely that the claimant tried to work in spite of his symptoms, not because they were less severe than alleged")(*emphasis in original*); <u>Reddick</u>, 157 F.3d at 722 ("Several courts, including this one, have recognized that disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations.").  The ALJ's reasoning, if accepted, would allow the Commissioner to punish claimants who demonstrate a willingness and/or an economic need to work notwithstanding a disability.  The ALJ's rationale not only is unconvincing but also is unpalatable.

Fourteenth, the ALJ asserts that Plaintiff is not credible, because Dr. Meltzer "questioned her effort or veracity." (A.R. 337.)  While Dr. Meltzer stated that Plaintiff "has a paucity of physical findings and I feel that most of this is because it is difficult to get her to cooperate totally" (A.R. 228), he did not question Plaintiff's veracity; indeed, he expressly stated that he considered Plaintiff to be

"reasonably reliable" (A.R. 221).   Hence, this reason also is not convincing.

Fifteenth, the ALJ asserts that Plaintiff appears to be "forum shopping," because:  her July 2002 application listed a post office box in Redlands, California, as her address; when she requested a hearing on April 30, 2003, she listed an address in Grand Terrace, California, which was the same address that a Redlands office of the Commissioner had used in communicating with her two months earlier; and even though Plaintiff had been receiving care at ARMC in San Bernardino County as of January 26, 2006, on February 25, 2006, the Commissioner sent mail to her at a post office box in El Centro, California, and El Centro falls under the jurisdiction of the Commissioner's Tucson, Arizona hearing office.  (A.R. 337.)   At the 2003 hearing, Plaintiff testified that people she spoke to at the San Bernardino Department of Public Social Services and ARMC told her to apply for social security benefits at the Commissioner's office located near ARMC, which Plaintiff did.  (A.R. 43, 46-47.)   The record also shows that Plaintiff listed the Redlands post office box address on her 2000 federal tax return, which was prepared on or before March 21, 2001.   (A.R. 78-79.)   Both Redlands and Grand Terrace are located in San Bernardino County, as is ARMC.  At the 2006 hearing, Plaintiff testified that:  her sisters and brothers support her financially; due to her financial circumstances, she lived with her five sisters at different times, some of whom lived in San Bernardino County, and some of whom lived in El Centro; and she continued to go to ARMC even after she went to stay with her sisters who lived in El Centro, because that is where she had been going for years, her siblings also went there for treatment, and she drove up from El Centro with them.

31

(A.R. 489-91.)  The record, in short, adequately explains Plaintiff's use of several different addresses over the years.  The ALJ's conclusion that this evidence shows forum shopping was not reasonable.  This basis for finding Plaintiff not credible rests on rank speculation not supported by the evidence.

Sixteenth, and finally, the ALJ found that Plaintiff was not credible because she "was able to participate in the administrative hearing and respond to the questioning without any apparent difficulties." (A.R. 338.)  It is not clear how Plaintiff's ability to respond to questions, when she is claiming a physical, not mental, disability, possibly could render her not credible.  It is also not clear how a mere ability to participate in a brief hearing renders Plaintiff's statements about her pain not credible.  In any event, and contrary to the ALJ's statement, during the hearing, Plaintiff expressed the need to stand up and continue her testimony while standing. (A.R. 505.)  The Ninth Circuit has disapproved of "'sit and squirm' jurisprudence."  Perminter v. Heckler, 765 F.2d 870, 872 (9th Cir. 1985)(a "[d]enial of benefits cannot be based on the ALJ's observation of [the claimant], when [the claimant's] statements to the contrary, as here, are supported by objective evidence").  An "ALJ's observations of a claimant's functioning may not form the sole basis for discrediting a person's testimony."  Orn, 495 F.3d at 639 (citing SSR 96-7p at 8).  Rather, an ALJ's personal observations "may be used only in 'the overall evaluation of the credibility of the individual's statements'" and when an ALJ's other reasons for finding a claimant not credible "fail, the ALJ's personal observations standing alone cannot support the adverse credibility finding."  Id. at 639-40 (citation omitted).  Here, each of

32

the ALJ's other reasons for finding Plaintiff not credible fail, for the reasons outlined above.  His observation that Plaintiff did not have any difficulty at the hearing, even if it were legitimate (and it appears not to be), standing alone, cannot support his adverse credibility finding.

There is no question that Plaintiff has impairments that, objectively, could cause the type and degree of pain she claims.  As discussed above, the ALJ failed to state clear and convincing reasons for rejecting Plaintiff's statements and testimony about her pain and attendant limitations.  Accordingly, the ALJ's finding that Plaintiff was not credible, and her statements and testimony should be "given only slight weight" (A.R. 338), was reversible error.

**C.**   **Remand And Payment Of Benefits Is Appropriate**.

As indicated above, the Court has found that multiple reversible errors occurred.  The Court, however, concludes that there is no reason to remand this case for further administrative proceedings.

In the Ninth Circuit, courts have the discretion to "credit as true" both the opinions of treating physicians and the testimony of claimants when the ALJ has failed to provide legally sufficient reasons for rejecting the same.  *See, e.g.,* Widmark, 454 F.3d at 1069; Benecke v. McCarthy, 379 F.3d 587, 594 (9th Cir. 2004); Connett, 340 F.3d at 876; Harman v. Apfel, 211 F.3d 1172, 1179 (9th Cir. 2000).  In addition, the decision whether to remand for further proceedings also is within the Court's discretion.  Harman, 211 F.3d at 1178.  As the Ninth Circuit

33

1  has repeatedly held, when the record is fully developed and a remand for
2  further administrative proceedings would serve no purpose, the Court
3  should remand for an award and payment of benefits.  *See, e.g.*, <u>Benecke</u>,
4  379 F.3d at 593; <u>Lester</u>, 81 F.3d at 834; <u>Smolen</u>, 80 F.3d at 1292.  That
5  principle governs here.

6

7      Plaintiff testified that she cannot sit for very long (*e.g.,* 15
8  minutes) before she needs to "stand up and reposition."  (A.R. 487.)
9  She testified that, on "good days," she can walk 10 to 15 minutes, but
10 on "bad days," needs to stay home and not do much.  (A.R. 489, 495.)
11 She further testified that, when the pain is bad, she takes Vicodin, but
12 it makes her sleepy; she tries not to take it any more often than every
13 other day.  (A.R. 488-89, 493-94.)  She testified that she would be
14 absent from work one to three days a week, due to having bad days.
15 (A.R. 502.) She testified that she attempted to work in telemarketing,
16 but was fired after one day, because of her need to take breaks and
17 stand up, and to lie down once or twice a day.  (A.R. 504-05.)  Dr.
18 Evans opined that Plaintiff cannot stand more than 15 minutes nor sit
19 more than 30 minutes without a break, and she would be subject to
20 excessive absenteeism.  (A.R. 469.)

21

22     If such evidence is credited as true, which the Court believes is
23 appropriate under the circumstances, the record shows that Plaintiff is
24 disabled.  At the Commissioner's request, a vocational expert ("VE")
25 testified at the April 2006 hearing.  The VE testified that Plaintiff
26 could work as a medical receptionist, because this job does not require
27 the worker to sit for a particular length of time, but conceded that
28 available positions would be eroded because Plaintiff lacks computer

34

skills.  (A.R. 510, 512-13.)  Upon further questioning of the VE, the following colloquy occurred:

Q:    Let me ask you this. . . .  If, if we've got a person who can get by most of the days okay but as long as they're given a sit-stand option but maybe four hours of the week whether it could be a bad morning they're having or perhaps it's, it's 15 minutes here or there where they've got to lay down, they're not paying attention to what they're doing in other words, they've got to leave the workplace, is that going to be . . . accommodated in, in any of these occupations?

A:    No.

Q:    Okay, it is the amount of time or the, the unscheduled nature?

A:    It's the unscheduled nature and, and really the amount of time to lay down.  Nobody can go lay down on the job --

Q:    Okay.

A:     -- unless they own their own business.

Q:    So, four hours a week would be too much in your opinion?

A:    Correct.

35

(A.R. 513-14.)  Construing Plaintiff's testimony and Dr. Evans's opinion fairly, and accepting the testimony of the VE called by the Commissioner, there is no job available for Plaintiff in view of her limitations.  Hence, the Commissioner has not met his burden at step five and Plaintiff must be considered disabled.[11]

This case was remanded in 2004, based on errors by the Commissioner in his consideration of the opinions of Plaintiff's treating physicians and Plaintiff's subjective symptom testimony.  As discussed above, the Commissioner repeated these same types of errors on remand.  In Benecke, the Ninth Circuit emphasized that "[a]llowing the Commissioner to decide the issue again would create an unfair 'heads we win; tails, let's play again' system of disability benefits adjudication," and unfairly "delay much needed income for claimants who are unable to work and are entitled to benefits."  379 F.3d at 595.  In Moisa, 367 F.3d at 887, after finding that reversal was justified due to the ALJ's commission of clear error in rejecting the claimant's pain testimony, the Ninth Circuit concluded that a remand for an award of benefits, rather than for further proceedings on the credibility issue, was appropriate, reasoning: "The Commissioner, having lost this appeal, should not have another opportunity to show that [plaintiff] is not credible any more

---

[11]   The Court recognizes that the VE was not asked about, and did not *sua sponte* testify as to, each and every subjective symptom identified by Plaintiff and limitation identified by Dr. Evans. However, a lack of VE testimony about "the precise limitations established by the improperly rejected evidence" is not required in order for the Court to remand for the payment of benefits. *See* Benecke, 379 F.3d at 595 ("We now clarify that in the unusual case in which it is clear from the record that the claimant is unable to perform gainful employment in the national economy, even though the vocational expert did not address the precise work limitations established by the improperly discredited testimony, remand for an immediate award of benefits is appropriate.").

than [plaintiff], had he lost, should have an opportunity for remand and further proceedings to establish his credibility." *See also* <u>Sisco v. United States Dep't. of Health and Human Services</u>, 10 F.3d 739, 746 (10th Cir. 1993)(after noting that the claimant's benefits claim had been adjudicated by the Commissioner twice at all levels over a four-year period and finding that substantial evidence did not support the finding that the claimant was not disabled, reversing and remanding for an award of benefits, opining: "The Secretary is not entitled to adjudicate a case 'ad infinitum until it correctly applies the proper legal standard and gathers evidence to support its conclusion.'" (citation omitted)).

In this case, remand for an award of benefits, rather than for additional administrative proceedings, is appropriate. Thus, the Court finds that plaintiff was disabled throughout the relevant period, and reversal and remand for an award of benefits is warranted.

**CONCLUSION**

Accordingly, for the reasons stated above, the Commissioner's decision is REVERSED, and this case is remanded to the Commissioner for the payment of disability benefits to plaintiff. Judgment shall be entered in favor of Plaintiff and this action shall be dismissed with prejudice.

///
///
///
///

37

        IT IS FURTHER ORDERED that the Clerk of the Court shall serve copies of this Memorandum Opinion and Order and the Judgment on counsel for Plaintiff and for Defendant.

        **LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: September 10, 2008

                                        _____/s/_____
                                        MARGARET A. NAGLE
                                        UNITED STATES MAGISTRATE JUDGE

38